ANTHONY MARVELL SEMIEN #K7697A

**FILED** C

P.B.S.P. A.S.U. Section B12

P.O. BOX 7500

Cresent City, CA. 95531-7500

JUL 2 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ANTHONY M. SEMIEN | Case No.: C 07-2803 CW (PR) |
| Plaintiff, | |
| v. | Plaintiff's NOTICE OF MOTION |
| K. PEEPLES | AND MOTION OF OPPOSITION |
| Defendant. | TO DEFENDANTS MOTION FOR |
| | SUMMARY JUDGEMENT, MEMOR- |
| | -ANDUM OF POINTS AND AUTHOR- |
| | -ITIES IN SUPPORT THEREOF; |
| | (FEDERAL RULE OF CIVIL Procedure Rule 56) |

TO DEFENDANT K. PEEPLE AND DEFENDANTS REPRESE-
-NTATIVES:

PLEASE TAKE NOTICE that Plaintiff ANTHONY
MARVELL SEMIEN hereby moves the court for oppos-
-ition and dismissal of Defendants motion for
SUMMARY JUDGEMENT. The motion is made on the
grounds that Defendant K. Peeples did infact use
unnecessary and excessive force against Plaintiff
and is not immune from USC § 1983 civil liability.
This motion will be based on this notice of mo-
-tion, on the included memorandum of points
and authorities served and filed herewith as
well as on all the papers and records on file
in this action including all exhibits, document-
-ary evidence as may be presented along with

1  declarations in support of this motion.

2

3  DATED: Wednesday July 23rd 2008

4

5

6       signed: Anthony Maruell Semien #K76979
7       Printed: ANTHONY MARUELL SEMIEN
8                Plaintiff in Pro-Se

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

ANTHONY MARVELL SEMIEN #K76A7A
P.B.S.P. A.S.U./Section B12
P.O. BOX 7500
Cresent City, CA. 95531-7500


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION


| | |
|---|---|
| ANTHONY M. SEMIEN | Case No.: C 07-2803 C W (PR) |
| Plaintiff, | |
| v. | POINTS AND AUTHORITIES IN SU- |
| K. PEEPLES | -PPORT OF PLAINTIFF'S MOTION IN |
| Defendant. | OPPOSITION TO DEFENDANT MOTI- |
| | -ON FOR SUMMARY JUDGMENT |


( POINTS AND AUTHORITIES )

1. 42 U.S.C. § 1983. P.G. 5, 6

2. U.S. CONSTITUTION AMENDMENT 8 & 14. P.552 P.67

3. 28 U.S.C. § 1391 (b). P.G. 5

4. West V. Atkins, 487 U.S. 42, 48 (1988). P.G. 6, 7

5. Spain V. Procunier, 600 F.2d 189, 195 (9th Cir. 1979). P.G. 8, 14

6. 42 U.S.C. § 1997 e (e) (2000). P.G. 10

7. Herman V. Holiday, 238 F.3d 660, 665-6666 (5th Cir. 2002). P.G. 10

8. Allah v. Al-Hafeez, 226 F.3d 247, 252 (3d Cir. 2000). [P.6.11]

9. Kelly v. Curtis, 21 F.3d 1544, 1557 (11th Cir. 1994). [P.6.11]

10. FEDERAL RULE OF CIVIL PROCEDURE RULE 56 & 56 (e). [P.6.11y] [P8.11]

11. RAND v. ROWLAND, 154 F.3d 952, 963 (9th Cir. 1998) en banc. [P.6.11]

12. HUDSON v. McMillion, 503 U.S. 1, 6-7 (1992). [P.6.13]

13. 28 U.S.C. § 1746. [P.6.15]

## STATEMENT of the CASE

ON NOVEMBER 13th "2007" Plaintiff's Civil Rights Act complaint (42 U.S.C. § 1983) against Defendant K. Peeples was filed by the HONORABLE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA (OAKLAND DIVISION).

Plaintiff filed this action "in forma pauperis" with leave to proceed. Plaintiff stated in his complaint that Defendant K. Peeples violated Plaintiffs UNITED STATES CONSTITUTIONAL RIGHTS AGAINST "CRUEL & UNUSUAL PUNISHMENT (U.S. CON 8 AMEND.) on or about NOVEMBER 8th "2006".

The court concluded that venue was proper in this district because the acts complained of occurred in Cresent City which is located in this district, 28 U.S.C. § 1391 (b). The court also concluded that Plaintiffs complaint stated a cognizable claim of Plaintiffs allegations of excessive force against Defendant K. Peeples.

ON April 29th "2008" Defendant K. Peeples attorney Ms. LILY KORMAN conducted the DEPOSITION of Plaintiff and on JUNE 2nd "2008" Defendant K. Peeples motioned the court for summary judgement. Plaintiff hereby states his grounds for OPPOSITION to Defendants motion for SUMMARY JUDGEMENT.

## (AURGUMENT)

UNDER PROCEDURAL MEANS OF ENFORCEMENT UNDER 42 U.S.C. § 1983 (2000): The Civil Rights Act

of 1871 statue provides" Every person who, under color of any statue, ordinance, regulation, custom, or usage of any state or Territory or the District of columbia, subjects, or causes to be subjected, any citizen of the United states or other person within the jurisdiction thereof to the deprivation of any rights privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section any Act of congress applicable exclusively to the District of columbia shall be considered to be a statue of the District of COLUMBIA".

A prisoner may seek redress when a person acting under color of state Law deprives the prisoner of the rights guaranteed by the CONSTITUTION or FEDERAL LAWS (42 U.S.C. § 1983).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: [1] that a right secured by the constitution or laws of the United states was violated and [2] that the alleged violation was committed by a person acting under the color of state law (West v. Atkins, 487 U.S. 42, 48 (1988).

Defendant K. Peeples at the time of the incident in question was a correctional OFFICER for

r the CALIFORNIA DEPARTMENT of Corrections and Rehabilitations therefore acting under the color of Law and thereby satisfying the "second prong" of (West v. Atkins).

Plaintiff will now oppose defendant K.Peeples Motion for ~~SUMMARY~~ SUMMARY JUDGEMENT in chronological order to show a violation of Plaintiff's right against cruel & unusual punishment but also DUE PROCESS which is secured by the CONSTITUTION or laws of the UNITED STATES (U.S.CON. AMEND 8 & 14)

(Plaintiff's opposition to Defendant K.Peeples INTRODUCTION" Page 2")

P.G. 2
As pertaining to Lines 7-13 of Defendants summary judgement motion Plaintiff vehemently denies ever physically expressing frustration and the only verbal statement plaintiff made was a request to simply speak to the sergent (which is Plaintiff's right). At no time did plaintiff verbally or physically abuse any of the officers for any of the officers to feel threatened (see Plaintiff's Exhibit (A) Dep. Semien P.G. 19:22-25 & P.G. 20:1-14 & P.G. 23:14-22). There was also not even an attempt to physically abuse or abuse any of the officers, verbally.

(Plaintiff's opposition to Defendant K.Peeples "statement of Issue")

P.G. 2
As pertaining to Lines 17-27 of Defendants summary judgement motion Plaintiff states that defendant K-Peeples actions were malicious because they were un-called for which is the definition of malicious. As for sadistically plaintiff states that it is subjective. Case

1  in point example: Officer gives a suspect whom is unar-
2  med a verbal command to get on the ground or be shot.
3  As suspect complys to get on the ground the officer sh-
4  oots him anyway. That is sadistic and malicious. Here
5  plaintiff gave No indication that he would be a phy-
6  sical threat an only requested to speak with a sergeant.
7  Is that a Physical or verbal Threat? NO!
8  Guards may use force ONLY in proportion to the need
9  in each situation (Spain v. Procunier, 600 F.2d 189, 195
10 (9th Cir. 1979)).
11 If plaintiff had refused the direct order from Officer
12 McGuirt to "face the wall" Defendant Peeples would
13 have been justified in her actions because plaintiff
14 was given a direct order an resisted that direct
15 order while in direct physical contact with the off-
16 icers. Officer Peeples cannot reasonably believe th-
17 at her actions were constitutional under clearly es-
18 -tablished law. If this poor excuse is taken at fa-
19 -ce value that would mean a Non threatening an Non
20 physically ~~resistant~~ resistant inmate after simply requesting
21 to speak with a higher ranking official such as a serge-
22 -nt (which is Plaintiff's DUE Process right) only to be given
23 an order to "shut-up and face the wall" and he goes
24 to comply, only to then have another officer push him
25 against that wall in turn damaging his body is ludi-
26 -crous and beyond any logic. Plaintiff's understanding is
27 that there is No state or FEDERAL case law, AMENDMENT
28 or statue that would support Defendant contention that
29 they used force in good faith in a effort to maintar-

in or restore disipline when absolutely no force was
required. A person whether prisoner or non-prisoner mu-
st be given an opportunity to comply with any order
before any physical force is used as to not do so would
render complying with that order moot as you will get
the punishment for it anyway!

(Plaintiff's opposition to Defendants K. Peeples " page 3 statement of
the case")
    Pertaining to lines P.G.3 2-10 plaintiff does not oppose
as all of these are facts that are true.

(Plaintiff's opposition to Defendants K. peeples " pages 3-6 statement of
undisputed facts" with Plaintiff's "disputed facts")
A. Background Information:
① As pertaining to lines P.G.3 11-28, Plaintiff does not dispute.
② As pertaining to lines P.G.4 1-8, plaintiff partially disputes
although it is a fact that plaintiff recieved a 128 c.d.c.
write-up for a non-related incident which was 16 days after
the incident with Defendant peeples, Plaintiff states that
a c.d.c. 128 is the same equivalent to a verbal warning an
not a serious rule violation (c.d.c. 115 as pertaining to D-
efendants Exhibits 2 & 3) See also (Dep. semien 13:14-25,
14:1-25,15:1-25 & 16:1-21). Plaintiff states that had Defe-
ndant peeples & officer McGuirt handled this situation (sem-
ien v. peeples) the same appropriate way as the 11-25-06
128 c.d.c. verbal warning situation) this action would have
never been filed as there would have been no incident.
③ As pertaining to lines P.G.4 9-10, Plaintiff objects at Defendant
peeples attempt to bring unrelated and irrelevant charact-
-er evidence into this incident as it is also not admissable

④

in court concerning this incident and can be objected to in court.

B. Plaintiff's Refusal to Exit his cell and subsequent Agitation and Disruption of the escort:

As pertaining to Lines 16-20, Defendant Peeples never ordered Plaintiff to "cuff-up" but only stated "We got a cellmate for you" (see Again Dep. Semien 19:22-25 & 20:1-5).

As pertaining to Line 28 & Lines 1-2 Plaintiff vehemently objects to verbally swearing at any of the officers. Plaintiff believes defendant is once again trying to "paint a picture" of a hostile individual when All plaintiff asked for was to speak with a sergeant (see Again Dep. Semien 19:22-25 & 20:1-14).

As pertaining to Lines 4-15, Plaintiff at no time turned his body in any fasion of a threatening manner. Plaintiff only turned his "head" and asked to speak with a sergeant (see Dep. Semien 23:14-22 & (Plaintiff's Motion of opposition Page (8) above Lines 11-29 & Page (9) Lines 1-6).

C. SEMIEN's Alleged Lip Injury:

As pertaining to Lines 20-28 & Lines 1-4, Plaintiff does not dispute. However, according to Line 5, Plaintiff states that according to Defendant's Exhibit B & C exhibit C is Plaintiff's Reception Center evaluation. The documents of this incident is in the custody of Pelican Bay and Plaintiff was informed by Ms McLoughlin that the documents are confidential. In order to recover for mental and emotional injury suffered while in custody a plaintiff must first establish physical injury (42 U.S.C. § 1997e(e) (2000) (Herman v. Holiday, 238 F.3d 660,665-666 (5th Cir. 2002). Plaintiff at no time stated mental and emotional injury:

ury but Punitive Damages (See Dep. Semien 34: 21-25). See also (Allah v. Al-Hafeez, 226 F.3d 247, 252 (3d cir. 2000) & (Kelly v. Curtis, 21 F.3d 1544, 1557 (11th cir. 1994) as Punitive damages remains available to successful litigants. At no time in Defendants motion for summary judgement did defendant deni-e that this incident happened the way that plaintiff stated the facts.

(Plaintiff's opposition to Defendant K. Peeples "Legal Standard for Summary Judgment")

   As pertaining to Lines 8-28 & Lines 1-4, Plaintiff only sta-tes that these case laws exist. However, plaintiff contends th-at as stated above ON Nov. 13th "2007" the U.S. District Court stated that plaintiff stated a cognizable claim. As stated above At no time did defendant in their motion for summary judgment denie the stated facts of plaintiff, It is settled that FEDER-AL RULE of Civil Procedure 56 says in order to oppose a motion for summary judgment "you (opposing party) must set out specif-ic facts in declarations, depositions, answers to interrogato-ries, or authenticated documents, as provided in Rule 56(e) that contradict the facts shown in the defendants declar-ations and documents and show that there is a genuine issue of material fact for trial". (Rand v. Rowland, 154 F.3d 952, 963 (9th cir. 1998) (en banc).

   Also according to both Defendant Peeples and Officer McG-uirt's Declaration they tell slightly different versions of when plaintiff was taken out of his cell. According to defendant Peeples declaration on Page 2 Lines 19-25 (Dec. Peeples page 2 Lines 19-25) defendant states that As plaintiff backed out of his cell plaint-

-iff turned his head toward OFFICER McGuirt and was swearing and agitated and this caused defendant to sense a potential threat to the officers safety. However, OFFICER McGuirt in his declaration on page 2 lines 14-21 (Dec. McGuirt Pg 2 Lines 14-21) states at No time did I yell any swearing obsenities or was agitated nor did I turn toward him in a threatening manner for him or OFFICER Bachman to fear for their safety but stated that Plaintiff simply ask to speak with a sergent (which is Plaintiffs Due process right when he feels that he is being mis--treated and cannot get any cooperation at the Correction officer Level). OFFICER McGuirt would know what I said because plaintiff was speaking directly at him when plaintiff made his request to speak with a sergent. Plaintiff states that defendant is unjustly trying to paint a picture of a "hostile individual" whose actions gave rise to a potential threat to officers safety when the declaration statement of the facts by officer McGuirt does not corroborate this contention. Further more it is ironic that defendant in her declaration would denie shoving plaintiff against the wall but then contridict that declaration by basically admitting the action in thier motion for summary judgment (Although claiming "de minimus" defense). Due to this contridiction there does exists a genuine issue concerning a material fact that can be used at trial. Therefore plaintiff contends defendant should not be entitled to summary judgment and this case should proceed to trial.


(Plaintiff's opposition to Defendant's SUMMARY JUDGMENT MOTION of "ARGUMENT")
    As pertaining to P.6, 7 lines 10-24 of (Defendants Motion for summary judgment), Plaintiff states that on pages (11) & (12) lines 25-29 and lines 1-25 of Plaintiff opposition motion plaintiff has already

address this issue and need not repeat himself.

As pertaining to defendants summary judgment motion of page 7 Lines 25-28 & page 8 Lines 1-18, Plaintiff also states that on pages (7) & (8) Lines 24-29 & Lines 1-29 as well as page (9) Lines 1-6 of Plaintiff's opposition motion Plaintiff has address this issue as well.

As pertaining to defendant's summary judgment motion of page 8 Lines 19-28 & page 9 Lines 1-18, Plaintiff contends the defendant relies on the "De Minnimus" defense. However, plaintiff contends that the (HUDSON V. McMILLIAN, 503 US. 1, 6-7 (1992) case law pertains to situations were their was an obvious need for force and that the force used was to rest-ore discipline applied in good faith and that because of that need for force a "De Minnimus" injury was sustained. Given that there was no need at all for any force to be used by defendant; plaintiff believes that this defense of HUDSON is misplaced. If taken at face value this would mean that any officer in the state of California or any state in the UNITED STATES of America could remove a non-thr-eatening inmate out of his or her cell and simply because that inmate request to speak to a sergeant and thereby g-iving no physical resistance at all could then be shoved ag-ainst a wall inturn hitting his face and that be not maliciou-us I.E "uncalled" for or SADISTIC is preposterous. Defendant knew that Plaintiff was in restraints by his hands being behind his back in a vulnerable position and could not brace myself against her actions as well as defendant knew that there was abs-olutely NO! reason to even touch me (so as to only hold plaint-iff). It is the same as saying you pick up a gun and pull the tri-gger only to shoot someone and then claim later that you didn't know the gun was loaded. Why even pick up the gun and pull the trigger if the situation and need clearly never required it. Defen-dant knew of her intentions and because of that intent as

1 well as Plaintiff in that same non-threatening vulnerable
2 position knew that her actions were unlawful because wi-
3 -th the amount of force used in proportion to the need of
4 this situation (Spain v. Procunier) there was absolutely no need
5 for defendants actions and because defendant's intent that
6 made it malicious & sadistic. As pertaining specifically to
7 Page 9 Lines 6-15 of defendants motion for summary judgment Plainti-
8 ff has addressed this issue on page (10) Lines 21-30 & page (11) Lines    P.G.10
9 1-7 of Plaintiffs motion in opposition above.    P.G.11
10     As pertaining to defendants motion for summary judgme-
11 -nt Page 9 Lines 19-28 & Page 10 Lines 1-10, Plaintiff has already
12 addressed this issue in Plaintiffs opposition motion on Pages (11)
13 Lines 25-29 & Page (12) Lines 1-25 above.    P.G.11  P.G.12
14     As pertaining to defendants motion for summary judgment
15 Page 10 Lines 11-28, Plaintiff has addressed this issue in plai-
16 -ntiffs opposition motion on Page (10) Lines 4-18 above.
17     As pertaining to defendants motion for summary judgment
18 Page 11 Lines 1-14 particularly Line 4-6 defendant tells a different
19 story then Officer McGuirt in their declarations in how defendant
20 held Plaintiff. According to defendant (peeples declaration on page
21 2 Lines 22-25) officer McGuirt in his (declaration on Page 2
22 Lines 17-21) as they contridict themselves. As far as Page
23 11 Lines 10-14 of defendants motion for summary judgment defend-
24 -ant attempts to present circumstantial evidence, one cannot
25 take the size of individuals to accurately determine how much
26 force was used against a particular individual.
27     As pertaining to defendants motion for summary judgment
28 Page 11 Lines 15-28 & Page 12 Lines 1-17, Plaintiff contends (As Pl-
29 -aintiff does thru-out plaintiffs motion of opposition) that there
30 was no verbal or physical threatening manner from plaintiff
31 at any time before, during & after this incident which is the
32 thrust of plaintiffs opposition motion as this entire in-

cident was totally uncalled for.

(Plaintiff's opposition to Defendant K. Peeples Defense of "Qualified Immunity")

As pertaining to defendants Motion for Summary Judgement of Pages 12 Lines 19-28, Page 13 Lines 1-28 & Page 14 Lines 1-25, Plaintiff contends defendant should not be entitled to immunity because Plaintiffs intent (Given the facts & contridictions of Defendant & Officer McGuirt) clearly shows that defendant with an "evil intent" intended to cause Plaintiff physical harm when absolutely No reason justified defendants actions. Plaintiff stands on Plaintiff's entire motion in opposition to content this asserted immunity.

## (PLAINTIFF'S CONCLUSION)

FOR THE FOREGOING reasons Plaintiff respectfully request that the HONORABLE COURT Dismiss Defendants Motion for Summary Judgment and grant Plaintiffs Motion of Opposition as the evidence is disputable and there does exist a triable controversy. Also Plaintiff request that defendants (Proposed) ORDER to grant Defendant's Motion for SUMMARY JUDGMENT be dismissed also.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: Wednesday July 23rd 2008

signed: Anthony Maruell Semien #K76879
printed: ANTHONY MARUELL SEMIEN
Plaintiff in Pro-peia (Propria Persona)

# DEPOSITION OF PLAINTIFF
## A. SEMIEN

PLAINTIFF'S
EXHIBIT A
CASE NO.: C 07-2803 CW (PR)
ANTHONY M. SEMIEN v. K. PEEPLES

1   Violation Reports?

2       A.   From what I'm here for now?

3       Q.   Former.

4       A.   Yeah.

5       Q.   And that was a CDC 115?

6       A.   Yes.

7       Q.   And do you know if you have information chronos

8   in your file?

9       A.   Not on me.

10      Q.   Not on you?

11      A.   No.

12      Q.   But you are familiar; you've seen that?

13      A.   Yeah.

14      Q.   I just want to show you -- I have a 128 here, and

15  I just want to ask you if it looks familiar.  So you can

16  go ahead and look at this.

17           MS. KORMAN:  I'm going to ask the court reporter

18  to mark this Exhibit 2.

19           (Whereupon, Defendant's Exhibit No. 2, CDC 128,

20           Semien, K-76-979, signed by R.K. Bell on

21           12/28/06 was marked for identification and

22           attached hereto.)

23           And for purposes of identification, it's a

24  general chronological report; it memorializes your

25  behavior and refusal to take a cellmate on November 25th,

1    2006.

2    BY MS. KORMAN:

3        Q.   Do you recognize that document?

4        A.   Yes.

5        Q.   Could you just tell me what you remember, with

6    that incident?  You can go ahead and read through it, if

7    you like.

8        A.   Well, basically, they wanted me to cell up with

9    an inmate, and the only thing I required is that I talk to

10   the inmate first, because in 2005 Pelican Bay had a

11   situation where an inmate killed another inmate.  So I

12   make it a priority -- I don't care what the rules say; I

13   make it a priority for myself, my own well being, to know

14   who I'm going to live with.  And he wouldn't give me that

15   opportunity, so I said if you're not going to give me the

16   opportunity to find out who this inmate is -- because I

17   don't cell with any -- don't cell up with inmates that I'm

18   not familiar with without allowing me to at least talk to

19   them and find out who they are.

20       Q.   And who is "he" that you're referring to?

21       A.   Inmate Beckman.

22       Q.   But are you talking about the officer?

23       A.   Oh, the officer that I was talking to, I told him

24   that I wanted to speak to inmate Beckman before he brings

25   him in here to be my cellmate.

1     Q.  And are you familiar with the rules regarding

2  celling, or having cellmates?

3     A.  We're supposed to take a cellmate, but it's also

4  -- I don't know I can say policy, but any officer that

5  knows about this will tell you that they try to make sure

6  that inmates that cell up are compatible with each other.

7     Q.  Right.

8     A.  If you refuse a cellie, you are susceptible to

9  get a write-up, but to my -- I look at it like this:  I

10  would rather take a write-up any day than be in a cell --

11  put in a situation where they're going to drag his damn

12  body out or my damn body out.

13     Q.  Is there the opportunity to talk to the cellmate

14  after you've complied with orders?

15     A.  That -- that -- see, the thing is, when they come

16  and talk to you and say okay, we got a cellmate for you,

17  they're supposed to let you at least talk to this inmate,

18  because if he says he's not going to cell up with you or

19  if you say you're not going to cell up with him, they

20  cannot force you to cell up, because that will cause

21  problems and that's a breach of prison security.

22     Q.  Can either of you say "I don't want to cell

23  without having talked to one another first"?

24     A.  We can, but then they'll try to write us up.

25     Q.  I see.  And so that's -- in terms of this

1  incident, that's what happened?

2      A.  Yes, it was.

3      Q.  Because it says here that they do actually review

4  your case factors, "they" being the officers and

5  institution, and they determine that you are compatible.

6  So it sounds like you may feel more comfortable talking to

7  the cellmate first?

8      A.  Exactly.  Because what this does is, the only

9  thing they do is they look in your file, they say okay,

10  put a nonaffiliate with a nonaffiliate, or if he's an

11  affiliate he's put with an affiliate.  So they'll put a

12  gang member with a gang member, nonafilliate with a

13  nonafilliate, but that don't mean the nonaffiliate is

14  compatible with that individual.  So that's all that is.

15      Q.  Okay.  And have you ever double-celled in your

16  prior terms?

17      A.  I've always double-celled.  And I've always had

18  this same -- not write-ups, but I've always had the same

19  criteria:  Let me talk to him, see where his head is at.

20  But this day he said, "No, either take him or the

21  write-up."  "Okay; I'll take the write up."

22      Q.  Other officers let him speak to you?

23      A.  Yes.

24      Q.  This is the only one.

25          So let's turn to the complaint in this case.

1       A.   I would say slim.  Not husky, not fat, none of

2   that.

3       Q.   And Officer McGuirt, what does he look like?

4       A.   He's about six-two, six-three maybe; he's bald

5   head, meaning no hair; he's kind of stocky; moustache.

6       Q.   Okay.

7       A.   That's about it, that I can remember.

8       Q.   Had you seen Officer Peeples prior to this day?

9       A.   I want to say that when I first came here that

10  night, she may have been there at the intake.  I don't

11  want to say for sure, but I think she was there at the

12  intake on the 7th.  I might be wrong on that, but I think.

13      Q.   Do you remember anything about your intake, if

14  you, you know --

15      A.   When I first got here?

16      Q.   Yeah.

17      A.   Nothing; just that they gave me a TB test and

18  asked me some questions, and that was basically it.  They

19  didn't have a place for me at that time, so I stayed over

20  night here in the cell and then they moved me over there

21  on the 8th in the morning.

22      Q.   Okay.  And did Officer Peeples say something to

23  you when she came to your cell?

24      A.   Well, she just said, "We got a cellmate for you,"

25  and I said, "Well, let me speak to him."  And McGuirt was,

19

1    like, "No, cuff up." And I said, "No, I want to speak to

2    him." Then McGuirt took out his little mace, acted like

3    he was going to spray me, so I say, "know what? Cuff me

4    up. I want to speak to a sergeant immediately." And

5    that's when they opened my door.

6        But at that time they had brought the inmate

7    there, and he was standing up against the rail, Cordova,

8    and that's when they opened up my door and I -- I backed

9    out, slid to my right. I looked back at McGuirt. I said,

10   "Man, I want to speak to a sergeant right now," and he

11   told me, "Shut up. Shut the fuck up. Face the fucking

12   wall." And when I turned my head and went to face the

13   fucking wall -- excuse me -- face the wall, Peeples pushed

14   my back and my face hit right there against the wall.

15       Q.  Okay. So just taking it back, you cuffed up at

16   the cuff board?

17       A.  Yes.

18       Q.  And you backed out of the cell?

19       A.  Exactly.

20       Q.  When you backed out of the cell, was Officer

21   Peeples behind you at this time?

22       A.  Right here. McGuirt was standing right there.

23   (Indicating.)

24       Q.  And you're pointing to your right and your left?

25       A.  She was holding my right -- she had my right arm

1    and her hand on -- her left hand was, like, right here on

2    my back or, like, my shoulder part, up in that area

3    (indicating), and this arm was, like, holding -- I mean,

4    this arm was being held by this arm, her right arm.  So it

5    was, like, she had me, like, right arm here and left arm

6    up here at the back shoulder-blade area.  (Indicating.)

7        Q.  So she was standing behind you?

8        A.  To my right.

9        Q.  And you turned --

10       A.  No, I didn't turn towards her.  I turned towards

11   McGuirt.  When I said I want to speak to a sergeant

12   immediately, McGuirt was standing right there on the left.

13       Q.  When you turned, Officer Peeples still had her

14   hands on you when you turned to McGuirt?

15       A.  Yeah, she -- just, like, holding me.

16       Q.  And McGuirt answered you, said, "No, face the

17   wall," and then what happened?

18       A.  When you say "face the wall," it was, like, a

19   simultaneous action; when you say "face the wall" and I

20   turn my head like this, that's when she pushed my back,

21   and when she pushed my back, that, in turn, caused my face

22   to hit that wall, and that's how I ended up hitting my

23   lip.

24       Q.  How far away from the wall were you standing?

25       A.  I was standing right there (indicating).  I could

1  probably lick it with my tongue.

2      Q.  And what happened then?

3      A.  I told them -- I said -- excuse my language; I

4  said, "Bitch, you made me fucking bust my lip.  I want to

5  speak to the sergeant right fucking now."  Excuse my

6  language.  That's what I said.

7      Q.  I want to show you one thing, which is --

8  actually it's the Department of Corrections and

9  Rehabilitation; this is the Rules and Regulations under

10  Title 15.  And I have a copy for you to look at, and I'm

11  showing you this because, in terms of rules and

12  regulations, I want to be clear on what section (b) says.

13  So I'm wondering if you could read that out loud.  Take

14  your time, read it to yourself.

15          MS. KORMAN:  I have a copy for you as well.

16          And I'd like it to be marked Exhibit 3 for

17  purposes of identification.

18          It's Title 15, section 304 -- 3004 -- excuse me

19  -- (b).

20          (Whereupon, Defendant's Exhibit No. 3, Department

21          of Corrections and Rehabilitation, Rules and

22          Regulations, 3005(b), Obeying Orders, was marked

23          for identification and attached hereto.)

24  BY MS. KORMAN:

25      Q.  And whenever you're ready, if you could read it

1  out loud.

2       A.  3004 or 3005?

3       Q.  No, 3005(b), "Obeying Orders."

4       A.  "Obeying Orders."

5          "Inmates and parolees must promptly and

6      courteously obey written and verbal orders and

7      instructions from department staff, and from

8      employees of other agencies with authorized

9      responsibility for the custody and supervision of

10     inmates and parolees."

11      Q.  Thank you.

12         So when you initially refused the order, were you

13  disobeying section 3005?

14      A.  When I object to it, I wasn't disobeying no

15  order, because when I stepped out of my cell and I turned

16  my head, no one gave me an order to face the wall at that

17  time.  When I told McGuirt I wanted to speak to the

18  sergeant, he told me to "shut my mouth, face the fucking

19  wall."  I turned my head and faced the wall, and that's --

20  at that time that simultaneous action, blam, my head -- my

21  face hit that wall.  So there was no direct order at that

·22  time.

·23      Q.  The prior order, when Officer McGuirt came to

24  your cell and said, "Cuff up; you have a cellmate" --

25         Excuse me; Officer Peeples said that.

1    A.   Yes.

2    Q.   -- you said "no"?

3    A.   I said I want to speak to him first.  I never

4    said "no."  I said, "Who is it; I want to speak to him

5    first."  McGuirt never gave me a time -- when I told him I

6    want to speak to him first, all he did was pull out the

7    mace.  I said, "Okay, I want to cuff up, but I want to

8    speak to a sergeant."

9    Q.   And then after this incident, you said again, "I

10   want to speak to a sergeant"?

11   A.   Exactly.

12   Q.   And then what happened?

13   A.   They went and took me to speak to Sergeant

14   Pepioti.

15   Q.   Pepioti?

16   A.   Pepioti.  P-E-P-I-O-T-I, think.

17   Q.   And what did you tell Sergeant Pepioti?

18   A.   I told Sergeant Pepioti exactly what happened,

19   and I told him I wanted the 602 because I was going to

20   grieve this.

21   Q.   And what did he say?

22   A.   He said, "You'll get it."  He say, "You gonna

23   take a cellie."  "I guess if you're going to force me,

24   I'll sign it under duress," and I signed the chrono under

25   duress.

1      Q.  So just to go back once more, when you were

2  handcuffed, standing outside your cell, where was inmate

3  Cordova?

4      A.  He was standing at the rail, I would say about

5  maybe -- about six feet -- about six feet away.  He was

6  standing right there at the rail.

7      Q.  Was he handcuffed?

8      A.  Yes.  He was wearing an orange jumpsuit.

9      Q.  And had you seen him before?

10      A.  No.  He had just came from -- from what I found

11  out from later, after the cellie -- just came from Solano

12  Prison.

13      Q.  And there was Officer McGuirt, Officer Peeples --

14      A.  Peeples.  And another officer; I don't even know

15  who it was, because I wasn't even concentrating on them.

16      Q.  And were there any other witnesses?

17      A.  Inmate Banks at 125.  I think it was 125, yeah;

18  125 right next door.

19      Q.  Banks.  Okay.

20          And so when Officer Peeples had her hands on you,

21  how did she push you?  She pushed your back.  She pushed

22  with her hands?  Can you describe that?

23      A.  She took her left hand and put it, like, right by

24  my shoulder blade.  At the time she put it in the center

25  of my back and, like, pushed me up against the wall.  She

1    had no reason to.  I wasn't resisting.

2        Q.  So she moved her hand?  Because I think you said

3    her hand was on --

4        A.  Right here by my shoulder blade, and then at that

5    time it was right there in the middle of my back.

6    (Indicating.)

7        Q.  Okay.  I see.

8            So you told her "I busted my lip"?

9        A.  I said, "Bitch, look what the fuck you do; you

10   made me bust my lip."

11       Q.  What happened with your lip, with those injuries?

12       A.  Well, the next day I told her I got -- finally

13   got my 602; I wrote the 602 up, okay.  And I don't know

14   exactly what date it was, but it was in November.  I put

15   in a sick call request, because I told them I wanted to go

16   to the MTA.  They wouldn't let me go to the MTA, so they

17   told me to put in the sick call slip.

18       Q.  Who wouldn't let you go?

19       A.  I think it was -- it was an officer who came by

20   and did the count.  I said, "I need to speak to the

21   doctor," and he said, "For what?"  I said, "Because my lip

22   is busted."  He said, "Put in a sick call slip."  I can't

23   remember his name, but he was doing count.  It was the

24   same day, though.

25       Q.  That same day?

1          A.   That same day.

2              So that's when I got the 602, the next day.   And

3     then, like, I will say no more than maybe about -- I will

4     say maybe three or four days later, that's when I put in

5     the sick call slip.

6          Q.   Why did you wait three to four days?

7          A.   Because I couldn't get a sick call slip.   I

8     couldn't get nothing.   They wouldn't let me out of my room

9     to take a shower.

10         Q.   Why?

11         A.   I don't know.

12         Q.   Who wouldn't let you out?

13         A.   Whatever sergeant that was working.   Because you

14    got to remember, the way Pelican Bay is, the sergeants

15    very seldom come in the unit.   They come in, but they very

16    seldom come in when you ask them.   If you're going to ask

17    for something, you've got to ask another officer and then

18    they'll relate it to another sergeant.   So when I asked

19    the sergeant for a sick call, I kept getting -- when I

20    asked the sergeant for the sick call slip, I couldn't get

21    one.   So I had to end up waiting.   Then I finally got it.

22    That's when I put it in.   I sent it to the MTA.

23         Q.   When you asked for a sick call slip, did you

24    explain what happened to the sergeant?

25         A.   No.

1      Q.   Okay.  You just said, "I have an injury; I need a

2   --

3      A.   They knew about it because I put in the 602.

4   When I finally got one, I put in a 602, so they knew about

5   what was going on, and that, in my opinion, is why I think

6   that they didn't let me out my cell to take a shower.

7      Q.   Who gave you the 602 form?

8      A.   I want to say LeVegue.

9      Q.   So what happened after you put in the -- I'm

10  sorry --

11     A.   Sick call.

12     Q.   Sick call.

13     A.   A couple days later they say -- called me over

14  and I went to the MTA.

15     Q.   What is the MTA?

16     A.   A Medical Technician Assistant.  I think that's

17  what --

18     Q.   And then what happened?

19     A.   They looked at it.  They didn't do nothing.  They

20  gave me some pain killers.  They told me if it gets

21  infected again to contact them again.

22     Q.   Did you contact them again?

23     A.   No.

24     Q.   How did they look at it?

25     A.   They just, you know, pulled my lip down and

1   looked at it.  (Indicating.)

2       Q.  And you're pulling your lip out and down?

3       A.  Yeah, pulled it down and looked at it.  And I

4   told them I want them to take a picture.  They never took

5   a picture.

6       Q.  What did you want them to take a picture of?

7       A.  My lip, the cut part.

8       Q.  Where was it cut?

9       A.  See, from right here, right -- I don't know how I

10  can describe it to you; but right here (indicating), this

11  part hit my tooth and that caused it to cut.

12      Q.  Okay.  And it was bleeding?

13      A.  Yes.

14      Q.  So it was bleeding when you hit the wall?

15      A.  Well, I mean after.

16      Q.  After?

17      A.  After meaning you fill your mouth -- you fill it

18  up with blood.  You can see it.  That's when I told him I

19  want to speak to the doctor, and I told him I want the

20  602.

21      Q.  Okay.  And so you spoke to the doctor a few days

22  afterwards?

23      A.  After I put in a sick --

24      Q.  Did you still have the pain in your lip?

25      A.  I had pain.  My tooth was a little loose, and the

29

1    pain lasted for maybe a week, week and a half.

2       Q.  Okay.  Did it limit your ability to do anything,

3    that pain in your tooth?

4       A.  No, I just -- for, like, a few days I had to eat

5    on this side because this tooth was loose.

6       Q.  Okay.  Okay.  Do you still have pain there?

7       A.  It's long since gone, healed.

8       Q.  And had you complained or said to any of the

9    other officers repeatedly "I need to see a nurse" or "I

10   need to put in a sick call"?

11      A.  That day I did.  I even yelled up to the tower,

12   but they didn't even let me out of my cell.  I guess they

13   thought "we're going to have a problem here," so --

14      Q.  Who was the nurse that you saw?

15      A.  I don't remember her name.  It was a lady,

16   though, but I don't remember her name.

17      Q.  Do you have any documents from --

18      A.  No, they don't give -- all documents is supposed

19   to be on record.  You put in a sick call slip and they

20   call you.

21      Q.  So you don't have records from when you saw the

22   nurse?

23      A.  No.  They should have it.  CDC should have it.

24      Q.  So aside from inmate Cordova, who became your

25   inmate, and --

1    A.   My cellie.

2    Q.   -- your cellmate, and Banks who was next door,

3    did you tell anyone else about this incident?

4    A.   No.

5    Q.   No one else?

6    A.   The only other person that overheard what was

7    said was inmate Jackson.   He overheard it.

8    Q.   Where is his cell?

9    A.   He was in -- upstairs in, I want to say 228.

10    Q.   How do you know he heard?

11    A.   Because he yelled down when they left, "That's"

12    -- excuse my language -- "That's some fucked up shit, and

13    I heard that shit, man."   And that's when I told him,

14    "Yeah, man, they fucking bust my lip."   But inmate Cordova

·15    and Banks saw it.

16    Q.   When you requested to talk to a potential

17    cellmate, has an officer ever let you do that before?

18    A.   All the time.

19    Q.   All the time here?

20    A.   I'm talking about anywhere I'm at, any

21    institution.   I've been in three different institutions in

22    CDC, and that's Tracey, Jamestown, High Desert, and this

23    makes my fourth.   Even after this incident, every other

24    time that I've had a cellmate, they've always let me speak

25    to them.   That's why I don't understand why this time --

1      A.   (Witness nods head in the affirmative.)

2      Q.   Do you still have -- did you have a chin injury

3  from that?

4      A.   Yeah.  I don't know if you could see it, but it's

5  right there on the left side.

6      Q.   On your left side?

7      A.   Right here.  Right here.  (Indicating.)

8      Q.   I see a slight scar there.

9           Okay.  Did you seek treatment for that?

10     A.   Yeah.

11     Q.   And what happened?

12     A.   It got treated.

13     Q.   Did you get stitches?

14     A.   Nah, it was deep, but not that deep.

15     Q.   So did you get pain medication?

16     A.   Yeah, I took some pain medication for about a

17  week, I believe.

18     Q.   Was it sore or tender?

19     A.   A little bit.  The first couple days was numb,

20  then subsided.

21     Q.   Okay.  Okay.  So turning back to your complaint,

22  it looks like -- so you're requesting damages, and I'm

23  wondering how you arrived at the number 50,000.  Could you

24  just explain that number to me?

25     A.   Well, pain and suffering.  Punitive.

# DECLARATION OF DEFENDANT
# K. PEEPLES

CASE NO.: C 07-2803 C W (PR)
ANTHONY M. SEMIEN v. K. PEEPLES

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  THOMAS S. PATTERSON
   Supervising Deputy Attorney General
5  LILY A. KORMAN, State Bar No. 242688
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone: (415) 703-5507
    Fax: (415) 703-5843
8   Email: Lily.Korman@doj.ca.gov

9  Attorneys for Defendant K. Peeples

10

11
                IN THE UNITED STATES DISTRICT COURT
12
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
13
                       OAKLAND DIVISION
14

15  **ANTHONY MARVELL SEMIEN,**                    C 07-2803 CW

16                                 Plaintiff,      **DECLARATION OF K.
                                                   PEEPLES IN SUPPORT OF
17              v.                                  DEFENDANT'S MOTION
                                                   FOR SUMMARY JUDGMENT**
18  **K. PEEPLES,**
                                                   The Honorable Claudia Wilken
19                                 Defendant.

20

21       I, K. PEEPLES declare:

22       1.   I am a Defendant in this case, and employed by the California Department of

23  Corrections and Rehabilitation (CDCR) as a Correctional Officer at Pelican Bay State Prison

24  (PBSP), a position I have held for approximately twelve years.  I currently work in the

25  disciplinary unit in A-Facility.  I have also held the positions of Search and Escort Officer, and

26  Transportation Officer.  I am competent to testify to the matters set forth in this declaration, and

27  if called upon to do so, I would and could so testify.  I submit this declaration in support of

28  Defendant's motion for summary judgment.

Decl. Peeples Supp. Def.'s Mot. Summ. J.                        *Semien v. Peeples*
                                                                   C 07-2803 CW

                                    1

2.    On November 7, 2006, I assisted in processing inmates from the CDCR Transportation Bus into PBSP Receiving and Release. We process approximately 2-40 inmates per bus and there are two buses a week. Inmate Semien was one of the inmates being processed and I recall he was extremely argumentative and uncooperative with staff during the processing and housing procedure.

3.    On the night of November 8, 2006, I worked the afternoon shift from 2:00 p.m. to 10:00 p.m. as the Bravo (B) Facility Disciplinary Officer. My duties included coordinating orientation housing in anticipation of processing additional inmates into PBSP. Semien, with no reasonable explanation, stated that he could not be celled with anyone. Because of limited bed availability, it was necessary that all compatible and approved orientation inmates double cell.

4.    Under the direction of Sergeant Pepiot, Correctional Officers J. Bachmann and D. McGuirt accompanied me in escorting Semien from his assigned cell to the housing unit rotunda. Officer Bachman and I approached Semien's cell. Officer McGuirt met us at Semien's cell. I asked Semien to cuff-up and he refused to comply with this direct order. Correctional Officer McGuirt appeared and also ordered Semien to cuff-up. Semien continued to object and at this point I asked that Semien's cell door be unlocked so that he could exit.

5.    As he backed out of his cell, Semien turned his head left towards Officer McGuirt and was swearing and stating that he demanded to speak with the sergeant. When Semien was within arm's reach and with his back towards me, I placed restraints on his hands. Semien continued to turn his head towards Officer McGuirt and appeared agitated. When an inmate turns their head quickly to the left or right you anticipate or look out for that inmate to spit or head-butt if they are agitated, which Semien was. I used my right hand, which was already on Semien's back, to guide Semien towards the wall directly in front of him. The wall was within a few inches from his body. My left hand was already on Semien's left elbow. I exerted a small amount of pressure in order to maneuver Semien. I did not push Semien nor did I shove him into the wall.

6.    Officer Bachmann and I then escorted Semien to the rotunda. During this escort, Semien appeared agitated and repeatedly yelled, "Do you see this? Do you see they are taking me against my consent?" It was not until Sergeant Pepiot spoke with Semien regarding housing

Decl. Peeples Supp. Def.'s Mot. Summ. J.                                    *Semien v. Peeples*
                                                                            C 07-2803 CW

2

1    expectations that he agreed to be double celled. Semien was then assigned to his cell with a cell

2    partner without further incident.

3        7.    I did not use any unnecessary force prior to, during or after the escort of inmate

4    Semien. There is no medical report of injuries pertaining to an alleged incident before, during,

5    or after the escort.

6

7        I declare under penalty of perjury that the foregoing is true and correct. Executed on May

8    30 , 2008 at Crescent City, California.

9                                        K. PEEPLES

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. Peeples Supp. Def.'s Mot. Summ. J.

3

*Semien v Peeples*
C 07-2803 CW

# DECLARATION OF OFFICER
# D. McGUIRT

CASE NO.: C 07-2803 C W (PR)
ANTHONY M. SEMIEN v. K. PEEPLES

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DAVID S. CHANEY
Chief Assistant Attorney General
3 | FRANCES T. GRUNDER
Senior Assistant Attorney General
4 | THOMAS S. PATTERSON
Supervising Deputy Attorney General
5 | LILY A. KORMAN, State Bar No. 242688
Deputy Attorney General
6 |  455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
7 | Telephone: (415) 703-5507
Fax: (415) 703-5843
8 | Email:  Lily.Korman@doj.ca.gov

9 | Attorneys for Defendant K. Peeples

10

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | OAKLAND DIVISION

14

15 | **ANTHONY MARVELL SEMIEN,**

C 07-2803 CW

16 | Plaintiff,

**DECLARATION OF D.
MCGUIRT IN SUPPORT OF
DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

17 | v.

**K. PEEPLES,**

18 | Defendant.

The Honorable Claudia Wilken

19

20 | I, D. MCGUIRT declare:

21 | 1.    I have been employed by the California Department of Corrections and Rehabilitation

22 | as a Correctional Officer for seven years.  I currently work at Pelican Bay State Prison (PBSP) in

23 | the Psychiatric Segregated Housing Unit Search and Escort Program.  I am competent to testify

24 | to the matters set forth in this declaration, and if called upon to do so, I would and could so

25 | testify.  I submit this declaration in support of Defendant's motion for summary judgment.

26 | 2.    On November 8, 2006, I was working in Bravo (B) Facility.  I worked the afternoon

27 | shift from two o'clock p.m. to ten o'clock p.m. My duties included feeding inmates, conducting

28 | inmate counts and bed moves, and overseeing the orientation block.  This included making sure

Decl. McGuirt Supp. Def.'s Mot. Summ. J.

*Semien v. Peeples*
C 07-2803 CW

1 | that there were available cells for incoming inmates.

2 |     3.    On November 8, 2006, I was contacted by the Search and Escort Officer to consolidate

3 | current inmates to double cell in order to make room for incoming inmates. I informed inmate

4 | Semien, who was single-celled temporarily, that he would be sharing a cell with another inmate.

5 | Semien refused to cell with another inmate and stated that he was not moving. He wanted to

6 | speak with a sergeant so I contacted Sergeant Pepiot of the Search and Escort Office. Sergeant

7 | Pepiot and Officer Peeples arrived at my unit and Sergeant Pepiot instructed Officer Peeples,

8 | Officer Bachmann and I to escort Semien from his cell to the housing unit rotunda. New inmates

9 | are processed and assigned cellmates in the rotunda.

10 |     5.    At this point, we "popped" Semien's cell door, meaning that we asked it to be

11 | unlocked so that Semien could back out of the cell. Semien backed out of the cell and Officer

12 | Peeples applied handcuffs. We ordered Semien to side-step to his left. There is a one-foot wall

13 | divider between cells and Semien was ordered to remain in this area.

14 |     6.    After Semien backed out of his cell, he continued to turn towards me and demand that

15 | I let him speak to a sergeant. I ordered Semien to face forward.

16 |     7.    Semien stood very close to the wall, probably a few inches from the wall. When I

17 | ordered Semien to face forward, I saw Officer Peeples slide Semien closer to the wall. I recall

18 | that Officer Peeples had Semien secured by her right arm on his right side. Officer Bachmann

19 | was on Semien's left side. Officer Peeples did not push Semien nor did she shove him into the

20 | wall. Officer Peeples and Officer Bachmann then escorted Semien to the rotunda so that he

21 | could speak to Sergeant Pepiot.

22 |     8.    I did not witness Officer Peeples use unnecessary force against Semien. I witnessed

23 | Officer Peeples apply a strategic maneuver to guide Semien towards the wall. If I did witness

24 | any use of force, I would have written an incident report.

25 | ///

26 | ///

27 | ///

28 | ///

Decl. McGuirt Supp. Def.'s Mot. Summ. J.

*Semien v. Peeples*
C 07-2803 CW

1      9.    I am aware that Semien alleges that he could not put in a sick call to staff.  The MTA

2   (Medical Technical Assistant) walk the tier, or the area of the facility, every night.  An inmate

3   need only ask to receive a sick call slip.

4           I declare under penalty of perjury that the foregoing is true and correct.  Executed on

5   ~~May~~ June 2, 2008 at Crescent City, California.

6

7                                                          D. McGUIRT

8   40235443.wpd
    SF2007403202

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. McGuirt Supp. Def.'s Mot. Summ. J.

3